USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/2/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER CASSOLI,

                      Plaintiff,

      -against-

AMERICAN MEDICAL AND LIFE
INSURANCE COMPANY,

                    Defendant.

14-Cv-9379 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

In this breach of contract action, Peter Cassoli alleges that the American Medical and Life Insurance Company ("AMLI"), his former employer, failed to pay him the severance payment required by his retention agreement with AMLI. AMLI has moved to dismiss Cassoli's complaint pursuant to Fed. R. Civ. P. 12(b)(6). Because plaintiff has not sufficiently alleged that AMLI experienced a "change in control"—the condition precedent to AMLI being required to make a severance payment to Cassoli—he fails to state a claim upon which relief can be granted. Accordingly, AMLI's motion is granted.

I. BACKGROUND

The following facts are assumed to be true for purposes of this motion.

Plaintiff Peter Cassoli started working for AMLI, a registered New York insurance company, in January 2012 as its Vice President of Business Development. (Compl. ¶¶ 3, 7.) Eight months later, AMLI reorganized its management structure as part of a reduction-in-force. (*Id.* ¶ 8.) In an effort to retain Cassoli's services, the parties entered into a Retention Agreement in October of 2012. (*Id.* ¶¶ 9-11.) The Retention Agreement provided in relevant part as follows:

> In the event that there is a change in control or the Company terminates Employee without cause the Company shall provide Employee with severance pay equal to nine (9) months at his annual base salary rate. The Severance Pay shall be payable within 15 days after the Employee's last day of work.

(Retention Agreement, Ex. A to Compl.; Compl. ¶ 18.) The Retention Agreement does not define the term "change in control."

Approximately 19 months later, in May 2014, AMLI "entered into a voluntary agreement with the New York State Department of Financial Services (DFS) to 'cease its operations' and 'begin running off its existing business.'"[1] (Compl. ¶ 25.) AMLI's board of directors approved this voluntary agreement with DFS, and AMLI's Chief Executive Officer, Tucker Taylor, referred to DFS as the company's "new partner." (Compl. ¶¶ 25-26.)

In August of that year—three months after AMLI agreed to "cease its operations" and "begin running off its existing business"—Cassoli resigned. (*Id.* ¶¶ 25, 28.) The company subsequently failed to pay Cassoli his severance pay as set forth in the Retention Agreement. (*Id.* ¶¶ 21-23.)

In November of last year, Cassoli brought this action for breach of contract on the grounds that AMLI's agreement with DFS to "cease its operations" and "begin running off its existing business" constituted a "change in control" pursuant to the Retention Agreement. AMLI has now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. AMLI contends that (1) Cassoli's definition of "control" as being the "exercise [of] power or influence over" someone does not comport with the reasonable and

---

[1] DFS administers and enforces the New York Insurance Law and supervises the activities of such insurance companies as AMLI that do business in New York. *See* N.Y. FIN. SERV. LAW §§ 102, 201; *see also Who We Supervise*, NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, http://www.dfs.ny.gov/about/whowesupervise.htm.

2

ordinary meaning of the terms "control" and "change in control"; and (2) even under Cassoli's "misguided" definition, he has not pled sufficient facts to show AMLI underwent any "change in control" as result of its voluntary agreement with its regulator, DFS. (*See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss the Compl. ("Def.'s Mem.") at 1.) Because Cassoli has not alleged that the voluntary agreement effectuated a "change in control" within the terms of the Retention Agreement, AMLI's motion is granted.

## II. LEGAL STANDARD

"In evaluating a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor." *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) (citing *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011)). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" nor do "naked assertion[s] devoid of further factual enhancement." *Id.* (alteration in original) (internal quotation marks omitted). A complaint should be dismissed where the claims have not been "nudged . . . across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

### A. Contractual Interpretation

"In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreement[]." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Where a contract is "unambiguous on its face, its proper construction is a question of law." *Metro. Life Ins.*, 906 F.2d at 889 (discussing New York law); *see also PaineWebber Inc. v. Bybyk* 81 F.3d 1193, 1199 (2d Cir. 1996) ("[W]here 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined . . . by [a motion to dismiss].").

In interpreting a contract, words and terms are given their plain and ordinary meaning in the absence of contractual ambiguity. *See, e.g., Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dept. 1990). Ambiguity exists "where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture*, 595 F.3d at 466 (internal quotation marks omitted).

Conversely, a contract is unambiguous where the "language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (internal quotation marks omitted). Although one party may assert a different meaning for a particular term, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274,

4

1277 (2d Cir. 1989); *see also Sasson v. TLG Acquisition LLC*, 127 A.D.3d 480 (1st Dept. 2015).

Moreover, "the mere fact that a contractual term is undefined does not render it ambiguous per se." *United States v. Am. Soc'y of Composers, Authors & Publishers*, 309 F. Supp. 2d 566, 573 (S.D.N.Y.), *as clarified*, 323 F. Supp. 2d 588 (S.D.N.Y. 2004); *see also Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001) ("[E]ven where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom [may fill] in the gaps left by the drafters.").

AMLI contends that the Court should interpret "change in control" in accordance with its reasonable and ordinary meaning, *i.e.*, as the "change in ownership or management" of a company. (Def.'s Mem. at 7.) Cassoli counters that because the term is undefined in the Retention Agreement, it is ambiguous on its face and therefore not subject to a motion to dismiss.

### B. Meaning of "Change in Control"

Although plaintiff asserts that the term "control" is ambiguous and therefore may be reasonably interpreted as the ability to "exercise power or influence over" (Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 8),[2] this broad interpretation does not comport with the reasonable and ordinary meaning of "change in control" of a corporation as supplied by the relevant case and statutory law.

An entity is in "control" of another within the reasonable and ordinary meaning of that term when the entity has the authority to direct the company's management and policies. New York Insurance Law, which

---

[2] Although Black's Law Dictionary defines "control" as "[t]o exercise power or influence over," as in, "the judge controlled the proceedings," the more relevant entry in Black's Law Dictionary defines "corporate control" as the "[o]wnership of more than 50% of the shares in a corporation" or "the power to vote enough of the shares in a corporation to determine the outcome of matters that the shareholders vote on." *See* Corporate Control Definition, Black's Law Dictionary (10th ed. 2014).

5

governs AMLI as a domestic insurance company, defines "control" as the "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an institution, whether through the ownership of voting securities, by contract or otherwise." N.Y. INS. LAW § 107; *see also* N.Y. INS. LAW § 1501.

Similarly, the New York Business Corporation Law defines control for the purposes of a "change or potential change in the control of a corporation" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the corporation, whether through the ownership of voting stock, by contract, or otherwise." N.Y. BUS. CORP. LAW § 717; *see also UBS Sec. LLC v. Red Zone LLC*, 77 A.D.3d 575, 578, 910 N.Y.S.2d 55, 58 (1st Dept. 2010) (interpreting the "plain meaning" of control as the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise").

Although neither statutory scheme expressly defines "change in control,"[3] federal tax authority may provide some guidance as to how a "change in control" may be defined or triggered. In regulating the taxation of deferred compensation, which may include severance payments such as those at issue here, the Internal Revenue Code and its accompanying regulations define a "change in control event" as (1) a "change in the ownership of a corporation"; (2) a "change in the effective control of a corporation"; or (3) a "change in the ownership of a substantial portion of the assets of a corporation." 26 C.F.R. § 1.409A–3(i)(5); *see also* 26 U.S.C. § 409A(a)(2)(A)(v). Federal tax law applicable to golden parachute payments[4] also provides similar definitions for "change[s] in ownership or

---

[3] New York Insurance Law does contemplate the *acquisition* of control "by purchase of [a domestic insurer's] securities." N.Y. INS. LAW § 1506.

[4] A golden parachute is an "employment-contract provision that grants an upper-level executive lucrative severance benefits—including long-term salary guarantees or

6

control." 26 C.F.R. § 1.280G-1, Q-27, Q-28; *see also* 26 U.S.C. § 280G(b)(2)(A).

In addition, case law recognizes changes in control where there is a significant change to the ownership of shares and voting rights or management of a corporation. For instance, a change in control may be triggered by (1) mergers or tender offers, *see, e.g., Lamb v. Emhart Corp.*, 47 F.3d 551, 556 (2d Cir. 1995); (2) sales of substantially all of a corporation's assets or a controlling interest in its stock, *see, e.g., In re Bethlehem Steel Corp.*, 479 F.3d 167, 170 (2d Cir. 2007) (noting that a "change in control" means "essentially, the sale of the company"); *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998); or (3) a change in the majority of its board members, *see, e.g., Carter v. Muscat*, 21 A.D.2d 543, 544-46, 251 N.Y.S.2d 378, 379-81 (1st Dept. 1964); *Fischbein v. First Chicago NBD Corp.*, 161 F.3d 1104, 1105 (7th Cir. 1998) (construing Delaware law and noting that a change in control has not occurred where "the same people who controlled the assets, the business, of [the corporation] before the merger controlled those assets, that business, after the merger").

In sum, a change in control contemplates—at a minimum—a change in the ownership or management of a corporation such that a new entity has the ability to direct the management and policies of the corporation. Plaintiff's broad definition of "control" as the ability to exercise power or influence over an entity "strain[s] the contract language beyond [the] reasonable and ordinary meaning'" ascribed to the term in the insurance industry and corporate context. *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957).

---

bonuses—if control of the company changes hands (as by a merger)." *See* Golden Parachute Definition, Black's Law Dictionary (10th ed. 2014).

### C. Cassoli's Allegations Are Insufficient to State a Claim for Breach of Contract

As noted above, Cassoli claims that a "change in control" occurred when AMLI entered into its voluntary agreement with its regulator DFS "to cease its operations" and "begin running off its existing business." (Compl. ¶ 25.) He asserts that because the voluntary agreement "effectively surrendered power and influence over the operations of the company to the state agency," it constituted a change in control. (*Id.* ¶ 26.) While this court is obligated to accept plaintiff's factual allegations as true, it is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Cassoli has made no allegation that DFS gained control over AMLI as that term is ordinarily defined. There is no allegation that DFS acquired (or maintained) the ability to direct or govern the management or policies of AMLI through a change in the controlling ownership or management of AMLI (for instance, by way of a merger, sale of all or substantially all of AMLI's assets, sale of a controlling stock interest, or change in AMLI's board of directors). An insurance company may agree with its regulator to "cease its operations" but this in no way supports Cassoli's argument that that agreement has led to a change in corporate control.

Moreover, aside from referring to DFS as AMLI's "new partner" (Compl. ¶ 27), Cassoli has not alleged any *change* in AMLI's relationship with its regulator or in DFS's ability *vel non* to direct the management and policies of AMLI.

DFS administers and enforces the New York Insurance Law, which regulates the activities of insurance companies such as AMLI. *See Med. Soc'y of State v. Serio*, 100 N.Y.2d 854, 863-64 (2003) ("Responsibility for administering the Insurance Law rests with the Superintendent of [Financial Services] . . . who has 'broad power to interpret, clarify, and implement the legislative policy.'"); *see also* N.Y. FIN. SERV. LAW §§ 102, 201. New York Financial Services Law § 201(b)(2) grants the

superintendent of financial services, who leads the DFS, the power to "take such actions as the superintendent believes necessary to . . . ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services."

Insurance carriers often have their practices approved in advance by regulatory authorities. *See Weiss v. La Suisse*, 154 F. Supp. 2d 734, 739 (S.D.N.Y. 2001) ("Indeed, in the heavily regulated insurance industry, carriers are often required to file prototypes of their policies with regulators, and have terms and conditions approved in advance."); *see also* N.Y. INS. LAW § 1506(b) (Superintendent of Financial Services may "disapprove" any acquisition of control of a domestic insurer if it is reasonably necessary to protect the interests of the people of New York); *id.* § 7105(a) (Superintendent shall approve any "merger or consolidation, or an agreement for the acquisition of assets"). Therefore, even if the Court credited plaintiff's all-too-broad definition of control, DFS *always* had a certain degree of power and influence over AMLI as its statutory regulator. AMLI's agreement with DFS to cease its operations certainly was not a "change in control."

Because Cassoli has not alleged a change in control consistent with that term's reasonable and ordinary meaning, his breach of contract claim is fatally deficient.

### D. Leave to Amend the Complaint is Denied as Futile

Fed. R. Civ. P. 15(a)(2) provides that a Court "should freely give leave [to amend a pleading] when justice so requires." Although leave to amend is liberally granted, it may properly be denied for, *inter alia*, futility of amendment. *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Mach.*

*Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Where a proposed amendment offers "no new facts or allegations for the court to consider," the district court does not abuse its discretion in denying plaintiff's leave to amend the complaint. *See Kropelnicki v. Siegel*, 290 F.3d 118, 130-31 (2d Cir. 2002).

Plaintiff seeks leave to amend the complaint to amplify his allegations that the voluntary agreement with the state insurance regulator constituted a "change in control." The central allegations he seeks to add are the following:

- On or about March 12, 2014, the New York State Department of Financial Services notified AMLI that the agency was "planning a targeted examination into the condition and affairs of the American Medical and Life Insurance Company covering the period January 1, 2013 through December 1, 2013" to start within the week.
- On or about May 5, 2014, Cassoli had a conversation with Taylor, AMLI's CEO, during which Taylor advised Cassoli that AMLI had reached an agreement with DFS that restricted the CEO's ability to allocate company funds and prohibited the company from paying a bonus to Cassoli.
- On or about May 19, 2014, DFS notified AMLI that it had "rejected" the risk-based capital plan AMLI had submitted to it. The agency further advised AMLI that "DFS has determined that the prudent course of action would be for AMLI to submit to a voluntary run-off of its business. A voluntary run-off plan is expected to include: the complete cessation of any new sales activity . . . ." The agency threatened "to consider taking other regulatory measures" "[s]hould AMLI choose not to cease its operations and begin running off its existing business."
- On or about June 13, 2014, Taylor submitted a "preliminary draft of AMLI's voluntary run-off plan" to DFS in response to the agency's May 19 letter. Among other provisions, the plan confirmed that AMLI had ended its sales activities and would

10

be notifying policyholders "of its intent to terminate coverage effective December 31, 2014." Previously, AMLI planned to rely on its existing stream of premium revenue to maintain operations while seeking new funding and/or partners to strengthen the company, improve compliance with regulatory requirements, and enhance profitability.
- The company's run-off plan contained a section titled "DFS Pre-Approvals," which stated in full: "In accordance with the recommendation made by the DFS, AMLI hereby represents as follows: 1) that it will make no changes in employee compensation without seeking and obtaining the prior written approval of the DFS; 2) that it will offer no dividend payments without seeking and obtaining the prior written approval of the DFS; 3) that its Directors and Officers liability insurance coverage will remain in effect until the current policy expires or at such time as the business has been dissolved, whichever occurs first; and 4) and [sic] that it will not impose any premium rate increases on any lines of coverage."
- Taylor confirmed the significant operational role played by DFS when he told Cassoli, on or about July 7, 2014, that "the state keeps telling us they're our partners, so we've asked them what to do."

Pl.'s Opp'n at 14-16.

These new allegations fail to plausibly allege a change in control. Plaintiff's allegations make clear that DFS is taking the regulatory measures it deems appropriate to ensure the solvency of AMLI. *See* N.Y. FIN. SERV. LAW § 201(b)(2). DFS has the regulatory authority to undertake an examination into the affairs of AMLI pursuant to N.Y. INS. LAW. § 309, and its alleged actions here constitute an exercise of its regulatory authority, as plaintiff's allegations readily admit. (*See* Pl.'s Opp'n at 15.) There is no allegation that AMLI was sold, acquired, consolidated, or dissolved or that there was a change in its controlling management or

11

ownership such that DFS had a newfound ability to direct the management and policies of the corporation.[5]

Accordingly, plaintiff's request to amend the complaint is denied as futile on the grounds that the proposed allegations could not withstand a Rule 12(b)(6) motion to dismiss. *See Lucente*, 310 F.3d at 258; *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

## IV. CONCLUSION

Because Cassoli has not sufficiently alleged that AMLI experienced a "change in control"—the condition precedent to plaintiff receiving a severance payment—he fails to state a claim upon which relief can be granted. AMLI's motion to dismiss the complaint is therefore granted, and plaintiff's request for leave to amend is denied.

Dated: New York, New York
June 2, 2015

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.

---

[5] Even if the Court were to assume *arguendo* that DFS had acquired a new power to direct or control the management and policies of AMLI, Cassoli's proposed allegations are centered on a *"preliminary* draft of AMLI's voluntary run-off plan." (Pl.'s Opp'n at 15 (emphasis added).) Cassoli has not alleged that the voluntary run-off plan was ever implemented prior to his resignation on August 31, 2014, if at all. Since a change of control becomes effective the date an agreement is implemented or effectuated—and not before—*see Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*, 203 A.D.2d 40, 43, 610 N.Y.S.2d 209 (1st Dept. 1994); *Allen v. WestPoint-Pepperell Inc.*, No. 90-Cv-3841, 1996 WL 2004, at *6 & n.9 (S.D.N.Y. Jan. 3, 1996), Cassoli's new allegations fail to allege a change in control, and the defect in his breach of contract claim remains.